In the Matter of the Bar Admission of:

Terry George RADTKE, Petitioner,

v.

Board of Bar Examiners, Respondent.

Supreme Court

*No. 99–0158–BA. Oral argument September 9, 1999.—Decided October 28, 1999.*

(Also reported in 601 N.W.2d 642.)

254

For the petitioner there were briefs by *Daniel W. Hildebrand* and *DeWitt, Ross & Stevens, S.C.*, Madison and oral argument by *Daniel W. Hildebrand.*

For the respondent the cause was argued by *Karen E. Timberlake,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. PER CURIAM. We review, pursuant to SCR 40.08(5), the decision of the Board of Bar Examiners (Board) declining to certify that Terry George Radtke satisfied the character and fitness requirement for admission to the Wisconsin bar. That determination was based on the Board's findings that Mr. Radtke had been discharged from his position as University lecturer in 1991 for unprofessional conduct, that he minimized that discharge and the underlying conduct on his bar admission application, and that he made several false statements at the hearing before the Board following its initial determination to decline his certification for bar admission.

¶ 2. We determine that the Board properly concluded, on the basis of facts that have not been shown to be clearly erroneous, that Mr. Radtke failed to meet his burden under SCR 40.07 to establish the requisite moral character and fitness to practice law "to assure to a reasonable degree of certainty the integrity and the competence of services performed for clients and the maintenance of high standards in the administration of justice."[1] Accordingly, we affirm the Board's decision declining to certify him for bar admission.

---

[1] SCR 40.07 provides:

**Proof of qualifications.**
The burden of proof shall be on the applicant to establish qualifications under SCR 40.02. Refusal of an applicant to furnish available information or to answer questions relating to the appli-

¶ 3.  Prior to his graduation from Marquette University School of Law in May 1998, Mr. Radtke was a lecturer in the Department of History at University of Wisconsin-Milwaukee (UWM) from August 1984 to May 1991. On his bar admission application, the reasons listed for leaving that position were low pay and no possibility of promotion. He also answered in the negative the application's question asking if he ever had been suspended, reprimanded, admonished,

cant's qualifications shall be deemed a sufficient basis for denial of the certification for admission.

SCR 40.02 provides, in pertinent part:

A person who meets all of the following qualifications shall be admitted to practice law in this state by order of the supreme court:

(1)   Has attained the age of majority under the law of his state.

(2)   Satisfies the legal competence requirements by diploma privilege (SCR 40.03), bar examination (SCR 40.04) or proof of practice elsewhere (SCR 40.05).

(3)   Satisfies the character and fitness requirements set forth in SCR 40.06.

. . . .

SCR 40.06 provides, in pertinent part:

(1)   An applicant for bar admission shall establish good moral character and fitness to practice law. The purpose of this requirement is to limit admission to those applicants found to have the qualities of character and fitness needed to assure to a reasonable degree of certainty the integrity and the competence of services performed for clients and the maintenance of high standards in the administration of justice.

(3)   An applicant shall establish to the satisfaction of the board that the applicant satisfies the requirement set forth in sub. (1). The board shall certify to the supreme court the character and fitness of qualifying applicants. The board shall decline to certify the character and fitness of an applicant who knowingly makes a materially false statement of material fact or who fails to disclose a fact necessary to correct a misapprehension known by the applicant to have arisen in connection with his or her application. . . . .

256

warned, censured, or otherwise disciplined in any position other than a regulated profession.

¶ 4. On the question of Mr. Radtke's employment, the chair of the UWM history department reported to the Board that Mr. Radtke no longer was employed there, that he had been informed that Mr. Radtke would not be rehired, and that Mr. Radtke had been terminated by the previous department chair. The current department chair responded in the affirmative to the question asking if Mr. Radtke had engaged in fraudulent or deceitful conduct, explaining that "[Mr. Radtke's] scholarly standing was compromised by an act of professional indiscretion."

¶ 5. After the Board notified him of the employment information it had received, Mr. Radtke submitted an amendment to his bar admission application in which he reported that in the fall of 1990 he had prepared a paper and submitted a version of it for publication to a number of journals, including the *Business History Review*. He explained that the paper was in the style of a public lecture and "did not include several key cites to secondary sources in the bibliography and paraphrased several sources that were not quoted." He stated that he "simply forgot to include the necessary footnotes in the paper" and asserted that the allegation that he had engaged in "professional plagiarism" arose from a letter the editors of *Business History Review* sent to the UWM History Department chair about the missing citations.

¶ 6. Mr. Radtke stated on the amended application that in a conversation in mid-January of 1991, the department chair told him he would attempt "damage control" and tell the journal editors Mr. Radtke's version of the matter. The chair also told Mr. Radtke that his employment at UWM probably would be at an end.

No further discussion occurred between the chair and Mr. Radtke.

¶ 7.  Mr. Radtke stated further that he had written a letter of apology to the journal editors and that no formal charges of professional plagiarism had been filed with any committee at UWM or with the American Historical Association—the chief organization having disciplinary authority over him. That, he asserted, was the reason he answered in the negative the question asking if he had been suspended, reprimanded, admonished, warned, censured, or otherwise disciplined.

¶ 8.  Mr. Radtke also explained that he never had been on a tenure track at UWM and consequently had no job security or future there. While he expected that winter 1991 semester to be his last, in late spring of that year the chair of Undergraduate Affairs offered him a one-year contract as lecturer in the UWM history department. Mr. Radtke stated that he assumed the former chair knew of that offer. However, Mr. Radtke said he "stuck with" his earlier decision to commit himself to existing commitments and declined the offer, telling the Undergraduate Affairs chair that he would no longer teach at UWM. In addition to the "low pay, no possibility of promotion" reasons he had given on his original application for having left UWM, Mr. Radtke stated that he had concluded that if he were to complete matters to which he had committed himself, he would have to devote himself to necessary research, writing and travel.

¶ 9.  After reviewing Mr. Radtke's statement on the amended application, the former chair of the history department wrote the Board that while he might disagree in respect to some minor matters, Mr. Radtke's supplemental statement regarding his depar-.

ture from UWM was "in total an accurate account of the circumstances." He added that Mr. Radtke had been offered a one-year position with the history department because he, the former chair, had kept his promise not to disclose the plagiarism matter to anyone. He also asserted that by not accepting that employment offer, Mr. Radtke was adhering to the understanding he had with him that he would not return to UWM.

¶ 10. When the Board informed him of its intent to decline to certify his eligibility for bar admission on the ground of character and fitness, Mr. Radtke disputed the Board's assertion that he had ignored on his application the fact that his discharge from UWM had been kept secret by his agreement with the department chair and that he had been dismissed for cause. He requested and received a hearing before the Board.

¶ 11. Prior to that hearing, the former department chair submitted to the Board an affidavit regarding the communication he had received from the journal editor. The editor was extremely upset and said he would inform scholars of Mr. Radtke's violation of professional standards and do all in his power to ensure that he never again obtained academic employment. The chair stated that he did not condone Mr. Radtke's conduct but felt that the editor's proposed measures were extreme and that he prevailed upon him not to pursue his intended action by assuring him that Mr. Radtke would have no further employment in the UWM history department.

¶ 12. The chair stated that when he subsequently discussed the matter with him, Mr. Radtke explained that he had felt under great pressure to publish and had acted in haste and carelessness, an explanation the chair believed had at least some plau-

259

sibility. When he told Mr. Radtke of his assurance to the editor regarding his future employment at UWM, Mr. Radtke said that was acceptable. The chair opined that however reprehensible Mr. Radtke's conduct, it ought not serve as a permanent impediment to his renewed pursuit of a career and should be a mistake from which Mr. Radtke could learn and be allowed to recover. He added that he promised Mr. Radtke that he would not disclose the matter to any other individual or offer any official or public announcement as to the reasons for his disassociation from the UWM history department.

¶ 13. At the hearing before the Board, Mr. Radtke repeated his explanation regarding the submission of the article without appropriate footnotes and his discussion with the department chair in which he admitted having submitted the wrong version of the article. He stated that he told the chair that he was sorry and was willing to accept whatever disciplinary measures the journal editor might suggest. He asserted that the chair had said he would do some "damage control" and had told him his employment with UWM was in doubt. He reported that he sent a letter of apology to the *Business History Review* stating that he was responsible and willing to accept the blame as well as the consequences for his conduct, but he never heard from the journal again. He also never heard about the matter again from the department chair, and no formal charges were filed. He stated that the proper version of the paper with the necessary footnotes ultimately was published by another journal in 1993.

¶ 14. Mr. Radtke told the Board that the factors leading to his decision to sever ties with UWM included the facts that he had received a contract to write a

history of a veteran's organization from another state, which would involve travel and research time, and that he had yet to complete his doctoral dissertation. He also explained that he had been an employee at will at UWM from 1984 to 1991 under a series of one-year contracts and was part-time from 1987 to 1991. Accordingly, he said, he regarded his employment as a dead-end job, one he kept in order to have an academic base and because he enjoyed teaching. He said it was for those reasons that he turned down the one-year contract offered to him in the spring of 1991. Mr. Radtke reported that he received his doctorate in 1993 and wrote a book that year, which was published by a commercial publisher.

¶ 15.   Mr. Radtke told the Board that there was no secret agreement between himself and the department chair and that he believed the chair was mistaken. He said that the chair had told him he was sorry that the matter had occurred and that he did not want to impede Mr. Radtke's career. In respect to the alleged plagiarism, Mr. Radtke asserted that he had not provided source citations to materials quoted in his paper and to various facts, individuals, and chapters in a political movement or political campaign, most of which he had taken from secondary articles. He acknowledged that he should have mentioned those articles as sources.

¶ 16.   After the hearing, the Board obtained from the *Business History Review* a copy of the paper Mr. Radtke had submitted for publication, a copy of the letter the journal editor wrote to Mr. Radtke, and a copy of Mr. Radtke's response. The editor's letter enclosed a report that described the plagiarism as a copying of source text of two publications more or less verbatim and called the plagiarism generally "crude

and blatant." At the hearing, Mr. Radtke had stated that he understood why the editors were concerned but that he did not design the article to slip it through, adding that if that had been his intent, the article would have been more sophisticated, and word-for-word text would not have been used. In his response to the journal editor, he stated that he understood the serious nature of his mistakes regarding professional standards and conduct, took full responsibility for his actions, and was willing to accept any penalties the editorial board felt were appropriate.

¶ 17.  Following receipt of that additional material, Board staff reported in a memorandum to the Board that Mr. Radtke's descriptions of his paper were at variance with the evidence of the paper itself and with his letter to the editor. The memo concluded that Mr. Radtke deliberately had copied a substantial portion—more than half—of his article from other people's work, presented it as his own, and lied to the Board.

¶ 18.  In this review, Mr. Radtke contended that several of the Board's findings of fact and the inferences it drew from the evidence are clearly erroneous, that the Board impermissibly considered materials it obtained following his hearing before the Board, and that the Board failed to consider each of the factors set forth in its rule, BA 6.03,[2] to be considered in respect to

---

[2] BA 6.03 provides:

Use of Information. The Board will determine whether the present character and fitness of an applicant qualifies the applicant for admission. In making this determination through the processes described above, the following factors should be considered in assigning weight and significance to prior conduct:
  (a)  the applicant's age at the time of the conduct
  (b)  the recency of the conduct
  (c)  the reliability of the information concerning the conduct
  (d)  the seriousness of the conduct

a bar admission applicant's prior conduct. We find insufficient merit to any of those contentions to support Mr. Radtke's assertion that he has met his burden to establish the requisite character and fitness for bar admission.

¶ 19.   There is no merit to Mr. Radtke's contention that it was clear error for the Board to find that he had been discharged from his position as university lecturer for cause, namely, unprofessional conduct consisting of plagiarism in a professional article. The sworn statement of the former department chair and the information provided by the current chair constitute sufficient evidence to support the Board's finding concerning the circumstances surrounding and the reasons for Mr. Radtke's departure from UWM. Notwithstanding his insistence that he had not been given formal notice of discharge, it is clear that his employment as lecturer with the university was terminated, as it would not extend beyond the current semester, and that the termination was the direct result of the plagiarism incident.

¶ 20.   Mr. Radtke's statement on his admission application of the reasons for having left employment was misleading, for it presented the matter as a decision he alone made and that he had done so voluntarily. Further, when asked to supplement his response, Mr. Radtke reported that when offered future employment in the history department, he declined for the reason that he already had decided to leave as a result of low pay and lack of job security. He

--------

(e)   the mitigating or aggravating circumstances
(f)   the evidence of rehabilitation
(g)   the applicant's candor in the admissions process
(h)   the materiality of any omissions or misrepresentations
(i)   the number of incidents revealing deficiencies

made no mention of the former department chair's decision to bring his employment to an end in order to prevent the journal editor from taking further action against him in response to the plagiarism.

¶ 21. Thus, Mr. Radtke's statement on his bar admission application regarding the cause of his departure from university employment omitted a material fact, and the Board properly found that Mr. Radtke thereby minimized his culpability and responsibility for the termination. His assertion in this review that the evidence established merely that he and the department chair mutually agreed that he would not continue his employment is deceptive, as it suggests that Mr. Radtke had an equal voice in the agreement.

¶ 22. Also without merit is Mr. Radtke's contention that he did not commit plagiarism but "simply forgot to include the necessary footnotes" in the article he submitted for publication. He acknowledged that he had copied text from two scholarly articles nearly verbatim, and his assertion that he merely forgot to include footnotes disclosing the sources from which that text had been taken minimized the seriousness of his conduct as assessed by the journal editor and by his department chair. The journal editor's report on the "plagiarism" said, in part:

> In all cases the plagiarism consists of copying the source text more or less verbatim, occasionally shortening it or omitting parts or reordering sentences and paragraphs. In essence Radtke has simply copied rather more than half of his paper from other people's work and presented it as his own. . . . .
>
> The plagiarism is generally crude and blatant. At times efforts have been made to disguise it or to make material appear more directly relevant to the

region and time period Radtke purports to be study-
ing. . . . .

The above evidence makes it abundantly clear
that this is an extremely serious case of plagiarism,
carried out deliberately and with intent to
deceive. . . .

¶ 23. The evidence supports the Board's determi-
nation that Mr. Radtke minimized his conduct by
characterizing what he did as "paraphras[ing] several
sources that were not quoted" and having "simply for-
got[ten] to include the necessary footnotes" and
"several key cites to secondary sources in the bibliogra-
phy." The argument that if he had intended to
plagiarize, he would not have set forth text from schol-
arly journals verbatim, thereby running the risk of
detection by any person knowledgeable in the field, is
disingenuous.

¶ 24. While there is some merit to Mr. Radtke's
contention that, contrary to the Board's findings, he
never said at the hearing that he had prepared two
different versions of the article—one with and one
without footnotes—and submitted for publication the
version without the footnotes, his statements to the
Board at the hearing were, at best, ambiguous. When
asked whether he was suggesting that it was just an
error—that he took the wrong version of the article to
send to the publishers, he responded, ". . .I made a
number of drafts, as we all do when working on various
publications or various projects, and I was working
extensively on the non-citation draft, the wrong draft
as it were, and I put all [the material from two sources]
in there. . . .It basically was an error. . . .I simply sent in
the wrong paper. . . ." It is unclear from his statements
at the hearing whether one of the versions of the paper
contained no footnotes or omitted only the footnotes to

265

the text he had taken from the two scholarly journals. In any event, Mr. Radtke conceded in the course of this review that in his letter of apology to the journal editor he incorrectly stated that he had sent the wrong version of the paper.

¶ 25. The final fact Mr. Radtke contended was clearly erroneous concerns his statement at the hearing that the alleged plagiarism consisted of information taken from secondary sources. The Board found that statement to have been false for the reason that the material he had taken came from two articles published in professional history journals, not from the news and entertainment periodicals Mr. Radtke referred to in his statements to the Board. Moreover, while he made reference to two unnamed publications in connection with the omission of footnotes in the paper he submitted, his characterization of the kind of sources made no mention of professional history journals.

¶ 26. Mr. Radtke has failed to establish that any of the Board's findings is clearly erroneous. Each of the foregoing findings of fact is adequately supported by the credible evidence and the reasonable inferences that can be drawn from it.

¶ 27. Mr. Radtke next argued that the Board violated his right of due process of law by obtaining information concerning his university employment and his plagiarism after holding a hearing and then using that information to his detriment. It was his contention that if those materials had been available to him prior to the hearing, he could have examined them, refreshed his recollection, and given an appropriate explanation for them. In support of that contention, Mr. Radtke relied on the court's decision in *Application of Childs*, 101 Wis. 2d 159, 303 N.W.2d 663 (1981), in

which the court addressed a bar admission applicant's due process right in the bar admission process.

¶ 28. That reliance is misplaced. The court held in *Childs* only that the minimum required by the due process clause is that the bar admission applicant be apprised of the specific grounds for the Board's decision not to certify satisfaction of the bar admission requirements and have an opportunity to respond to that decision. *Id.*, 165. Here, as the Board asserted, it was not until the hearing that the Board learned of Mr. Radtke's apparent position that he had prepared two separate drafts of the article, and it was proper to conduct further investigation of the underlying circumstances concerning that issue. Moreover, the Board contended, the information it obtained following the hearing was not unavailable to Mr. Radtke, as he could have obtained it from the same source from which the Board did.

¶ 29. Nonetheless, better practice would have been for the Board to have notified Mr. Radtke of the additional material, even though it had been adverted to in the course of the application and hearing process, and of its intent to rely on that material in reaching a determination on the question of his character and fitness for bar admission. A full examination of the matter would have included the opportunity for Mr. Radtke to respond to that material, if only in respect to its authenticity.

¶ 30. Mr. Radtke's final argument in this review asserted that the Board erred in concluding that his unprofessional conduct and incomplete and untruthful disclosures were relevant to his character and fitness because it failed to take into consideration each of the nine factors listed in BA 6.03. We find no merit to that argument. First, Mr. Radtke incorrectly stated that the

Board considered only two factors—the seriousness of his conduct and his candor in the admission process. In fact, the Board also explicitly considered the lack of evidence of his rehabilitation and the materiality of his omissions in the admission process. Second, we rejected the same argument in *Saganski v. Board of Bar Examiners*, 226 Wis. 2d 678, 595 N.W.2d 631 (1999), holding that it is sufficient that the Board consider those BA 6.03 factors that are applicable to the conduct of the applicant.

¶ 31.   Because the Board's findings have not been shown to be clearly erroneous or its conclusion based on those findings to be improper, we affirm the Board's determination declining to certify Mr. Radtke's character and fitness for bar admission. We consider, then, the effect Mr. Radtke's conduct in the plagiarism incident and in the bar admission application process has on his eligibility to reapply for bar admission. In that regard, we take into account Mr. Radtke's professional record during the eight years following the plagiarism incident. Mr. Radtke pointed out that he admitted his mistake in the submission of his article for publication and took full responsibility for it, subsequently published the article with proper footnotes, published a book, completed his doctoral thesis and obtained his doctorate, and earned a law degree. He did all of that without any allegation of questionable conduct.

■

¶ 32.   While Mr. Radtke's recent characterizations of the plagiarism incident and the impact it had on his professional employment cause great concern, as they were made to the court's board charged with the responsibility of investigating and reporting on the character and fitness of bar admission applicants, we determine that Mr. Radtke should be permitted to

reapply for bar admission. As we did in *Matter of Bar Admission of Gaylord*, 155 Wis. 2d 816, 456 N.W.2d 590 (1990), and in *Saganski*, supra, we determine that a one-year period is the appropriate time for him to wait before reapplying and that, as in *Saganski*, the period commence the date of the Board's adverse decision, here, December 21, 1998. The time for Mr. Radtke's actual admission to the bar specified in the bar admission rules will be extended for the period of time reasonably necessary to accommodate his reapplication, should he reapply.

*By the Court.*—The decision of the Board of Bar Examiners is affirmed.

¶ 33. JON P. WILCOX, J., did not participate.